FILED BY _____ CG _____ D.C.

Apr 21, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI, FL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:2021-CR-80059-Middlebrooks/
Brannon

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

GREGORY ORR,

        Defendant.

_____/

## INFORMATION

The Acting United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times material to this Information:

### Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Physicians, clinics and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Part B Coverage and Regulations

6.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.      Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.  Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

8.      To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement.   The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9.      CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.     Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Cancer Genomic Tests**

11.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

12.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."  Title 42, Code of Federal Regulations, Section 411.15(a)(1).  Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing.  Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the

management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

14.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## Telemedicine

15.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

16.     Telemedicine companies provided telemedicine or "telehealth services" to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.  In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

17.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met.  These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

## The Defendant and Related Individuals and Entities

18.     LabSolutions, LLC, ("LabSolutions"), a company organized under the laws of Georgia and authorized to provide services in Florida, was a laboratory that purportedly provided

CGx testing to beneficiaries. LabSolutions held an account ending in 5953 at Branch Banking and Trust Company ("BB&T") ("LabSolutions Account").

19.    Company 1 was a limited liability company formed under the laws of Florida, with its principal place of business in Palm Beach County. Company 1 held an account ending in 3390 at Wells Fargo Bank, N.A. ("Wells Fargo") ("Company 1 Account").

20.    Defendant **GREGORY ORR**, a resident of Palm Beach County, Florida was a partner in Company 1.

21.    Individual 1, a resident of Palm Beach County, Florida, was the manager and registered agent of Company 1 and was **GREGORY ORR's** partner in Company 1.

22.    Company 2 was a limited liability company formed under the laws of Florida, with its principal place of business located in Broward County. Company 2 held an account ending in 1291 at BB&T ("Company 2 Account").

23.    Individual 2, a resident of Broward County, Florida, was the manager and registered agent of Company 2.

**COUNT 1**
**Conspiracy to Solicit and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

1.    The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around March 2017, and continuing through in or around January 2020, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**GREGORY ORR,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate and agree with others, known and unknown to the Acting United States

Attorney, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (a) soliciting and receiving kickbacks and bribes in return for recruiting and referring Medicare beneficiaries to LabSolutions; (b) submitting and causing the submission of claims to Medicare for CGx tests that LabSolutions purported to provide to those Medicare beneficiaries; (c) concealing the payment and receipt of kickbacks and bribes; and (d) diverting proceeds for their personal use and benefit, the use and benefit of others and to further the conspiracy.

### Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

4.      **GREGORY ORR** and co-conspirators obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to accept CGx tests regardless of medical necessity.

5.      **GREGORY ORR** and co-conspirators obtained doctor's orders and other Medicare-required documents that would be used to support claims to Medicare for the CGx testing ("doctor's orders") by paying telemedicine companies kickbacks and bribes for orders

written by doctors who contracted with the telemedicine companies, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

6.    **GREGORY ORR** and co-conspirators solicited and received, at least, $14,331,711 in kickbacks and bribes from LabSolutions in exchange for referring Medicare beneficiaries and doctor's orders to LabSolutions for CGx testing.

7.    **GREGORY ORR** and co-conspirators entered into sham contracts with LabSolutions that attempted to disguise the kickbacks and bribes as payments from LabSolutions for purported marketing services.

8.    **GREGORY ORR** and co-conspirators caused LabSolutions to submit false and fraudulent claims to Medicare in the approximate amount of $45,038,467.

9.    As a result of these false and fraudulent claims, Medicare made payments to LabSolutions in, at least, the approximate amount of $26,610,359.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.    On or about December 14, 2018, LabSolutions transferred a kickback payment of approximately $728,972 from the LabSolutions Account to the Company 1 Account.

2.    On or about December 14, 2018, Individual 1 transferred a kickback payment of approximately $220,000 from the Company 1 Account to the Company 2 Account.

3.    On or about May 8, 2019, **GREGORY ORR** and his co-conspirators referred Medicare beneficiary M.S. to LabSolutions for CGx testing in exchange for kickbacks and bribes.

4.     On or about June 6, 2019, LabSolutions submitted a claim to Medicare in the approximate amount of $7,115 for CGx testing purportedly provided by LabSolutions for beneficiary M.S.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.     The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about December 14, 2018, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**GREGORY ORR,**

did knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare, as set forth below:

| Count | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Kickback Payment |
|-------|----------------------------------|----------------------------------|-------------------------------|
| 2 | 12/14/2018 | $220,000 | Wire transfer from Company 1 Account to Company 2 Account. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## **FORFEITURE**
## (18 U.S.C. § 982)

1.      The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture to the United States of certain property in which the defendant has an interest.

2.      Upon conviction of a violation of Title 42, United States Code, Section 1320a-7b or a criminal conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, as alleged in Counts 1 and 2 of this Information, the defendant so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      The property subject to forfeiture includes, but is not limited to, the sum of money equal in value to the gross proceeds traceable to the commission of the violation alleged in this Information, which the United States will seek as a forfeiture money judgment as part of each defendant's sentence.

4.      If any of the property described above, as a result of any act or omission of the defendant:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been co-mingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY


ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


PATRICK J. QUEENAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

GREGORY ORR,

_____Defendant._____/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

| | |
|---|---|
| New defendant(s) | Yes _____ No _____ |
| Number of new defendants | _____ |
| Total number of counts | _____ |

**Court Division:** (Select One)
___ Miami    ___ Key West
___ FTL    ✓ WPB    ___ FTP

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)    No____
   List language and/or dialect    _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

(Check only one)

| | | |
|---|---|---|
| I | 0 to 5 days | ✓ |
| II | 6 to 10 days | |
| III | 11 to 20 days | |
| IV | 21 to 60 days | |
| V | 61 days and over | |

(Check only one)

| | |
|---|---|
| Petty | |
| Minor | |
| Misdem. | |
| Felony | ✓ |

6. Has this case previously been filed in this District Court?    (Yes or No)    No____
   If yes: Judge_____    Case No._____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?    (Yes or No)    No____
   If yes: Magistrate Case No.    _____
   Related miscellaneous numbers:    _____
   Defendant(s) in federal custody as of    _____
   Defendant(s) in state custody as of    _____
   Rule 20 from the District of    _____

   Is this a potential death penalty case? (Yes or No)    No____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?    Yes_____    No ✓

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?    Yes_____    No ✓

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?    Yes_____    No ✓

10. Does this case originate from a matter pending in the Southern Region of the U.S. Attorney's Office prior to November 23, 2020 (Judge Aileen M. Cannon)?    Yes_____    No ✓

Patrick Queenan
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5502715

*Penalty Sheet(s) attached

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

Defendant's Name: **GREGORY ORR**

Case No:

Count #:   1

Title 18, United States Code, Section 371

Conspiracy to Solicit and Receive Health Care Kickbacks

**\*Max Penalty:**     Five (5) years' imprisonment

Count #:   2

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

Receipt of Kickbacks in Connection with a Federal Health Care Program

**\*Max Penalty:**     Ten (10) years' imprisonment

Count #:

\*Max Penalty:

Count #:

\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| GREGORY ORR, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*


_____
*Signature of defendant's attorney*


_____
*Printed name of defendant's attorney*


_____
*Judge's signature*


_____
*Judge's printed name and title*